### DODGE NEEDLE CO. v. JONES.

(Circuit Court, E. D. Pennsylvania. April 3, 1907.)

#### No. 40, April Term, 1904.

1. PATENTS—CONSTRUCTION—PROCEEDINGS IN PATENT OFFICE—RETRACTED DISCLAIMERS—FINAL FORM OF APPLICATION.

Where, upon application for a patent for a pivot pin of a knitting machine needle, at the outstart of the proceedings in the Patent Office, the applicant, for the purpose of distinguishing certain references, made positive and reiterated declarations as to the headless character of the pins, but later was prompted to file a new and completely revised application, as a continuation of the proceedings, in which there were claims for a headed, as well as a headless, pin, the specifications being changed to correspond, which the examiner allowed and passed, although as the result of interference proceedings the headed claims were subsequently canceled, the patent (aside from the effect of the cancellation) is not limited, by such earlier declarations, to a headless pin; both specifications and claims, as allowed, being broad enough to include a headed one, and the final form in which the patent is cast being the one to be taken in determining the scope of the invention, which stands as it was asserted and accepted at the close of the proceedings, regardless of what had been declared previously.

2. SAME—INTERFERENCE PROCEEDINGS—CANCELLATION OF CLAIMS AFTER.

Where, however, interference proceedings with another party have been declared, as the result of which he is found to be the prior inventor of the headed form of pin, and thereupon the applicant for the patent in suit cancels the claims covering this form, and takes out a patent without them, he is precluded thereafter from asserting a right to anything but a headless pin, not because priority of invention was found in favor of the other patent, which may not be conclusive, but because by his own direct act, in response thereto, he canceled his claims for headed pins and accepted a patent in this restricted shape.

3. SAME—PRIOR PUBLIC USE—PUBLIC USE PROCEEDINGS—EFFECT OF.

The patentee having been defeated in interference proceedings as to one form of device, priority of invention being found in favor of the other party, at his instigation, in order to defeat the right of such party to a patent, public use proceedings were instituted, in which it was shown that for over two years prior to the time to which such party could carry

back his invention this form of the device had been manufactured and used by the company where the patentee was employed. *Held* that, while this showing was fatal to the right of the other party to a patent, it did not change the status of the patentee, or restore his rights to the device as in fact the prior inventor; his own patent having been already taken out after he had canceled claims covering this form.

4. SAME—KNITTING MACHINE NEEDLE—INFRINGEMENT.

The Currier patent, No. 743,152, for a knitting machine needle, if broad enough in terms to cover both a headed, as well as a headless, form of pivot pin, was anticipated as to the headed form, which cannot, therefore, be claimed; and, as so limited, *held* not infringed.

5. SAME—STRUCTURAL FORM—METHOD OF MANUFACTURE.

Semble, that where a patent is not for a product, the result of a method or process, but for an article of special mechanical structure, the method of manufacture cannot enter into it as a patentable element.

In Equity. Suit for infringement of letters patent No. 743,152 for a knitting machine needle granted to A. Currier November 3, 1903. On final hearing.

Nathan Heard, for complainants.
Francis T. Chambers, for defendant.

ARCHBALD, District Judge.[1] The pivot pins of knitting machine needles are pretty small to be patented, the largest needles being only forty-six thousandths of an inch thick, and the finest considerably less than that; but it is no doubt important that they should be right, and they have been made the subject of not a little inventive concern in consequence. Distinctions are not to be drawn too fine, however, nor too much made of the shading of a figure, or the disclosures of the microscope. It is only clear structural differences, involving a principle, that can be considered, which is not said to disparage the case, but to meet certain phases of it, as will be understood by counsel.

The knitting machine needles in controversy are manufactured by Friedrich Ernst Beckert of Chemnitz, Germany, of whom the defendant is the representative in the United States. They have the usual latch, pivoted on a pin, extending through the body of the needle; a longitudinal slot in the center being provided for the end of the latch, and the pin being fastened in place in the following manner: A conical depression is made at each end of the hole drilled for the pin, and, the latch and pin being put in position, pressure is applied to the ends of the pin by means of punches or dies, whereby the pin, being somewhat greater in length than the diameter of the needle, and being forced in upon itself by the pressure, is made to bulge in the center and to enlarge or swell out generally, filling the hole, and being upset into heads at either end. The ends of the punches are made large enough to extend over the heads of the pin and a portion of the adjacent sides of the needle, and sufficient pressure is applied to carry all that is so covered below the surface, forming a depression; the end of the pin being flush with and constituting a part of the bottom, and the edge or flange of the head projecting over and binding upon the sides of the depression adjacent to it. This corresponds in

[1] Specially assigned.

a general way with the form of needle manufactured by the complainants by virtue of the patent which they hold, infringement of which is therefore charged. It is to be noted, however, that, as an essential feature of the defendant's needles, the ends of the pivots are headed, while the complainants, as it is contended, are restricted to headless or substantially headless pins, this limitation, as it is said, not only being imposed by the prior art, if the patent is to be sustained, but also resulting from the proceedings in the Patent Office, on the strength of which the patent was obtained; and it is upon these considerations that the question of infringement turns.

The claims of the patent are as follows:

"1. A knitting machine needle comprising a body having a latch mounted on a pivot pin, the said pivot pin and the side walls of the body adjacent the ends of the pin being compressed to form depressions, the compressed ends of the pins coinciding with the bottom of the said depressions.

"2. A knitting machine needle comprising a body, a latch and a pivot pin in said body upon which said latch is loosely mounted, the side walls of the body adjacent the ends of the pins being compressed to form depressions, the ends of the pins being flush with and forming a portion of the bottoms of the said depressions.

"3. A knitting machine needle comprising a body, a latch, and a pivot pin in said body upon which said latch is loosely mounted, the outer side walls of said body having that portion which surrounds and is concentric with the ends of the pivot pin compressed to form depressions, the pivot pin also being compressed longitudinally thereof and the ends of said pin when compressed being flush with and forming a portion of the bottom of the depressions."

Nothing is said, it will be observed, in either of these claims as to whether the ends are to be headed or headless; so that, if the way is otherwise clear for it, the one is as consistent with what is there declared for as the other. Neither is there anything in the specifications to limit the device in this particular, and, on the contrary, both forms are expressly spoken of; the only restriction suggested as to the one being that the heads are small. Nor can the case be made to turn on whether those figures, which are supposed to stand for the headed form, do or do not show the edge or flange of the head extending over onto the bottom of the countersink. Examining with a glass, this seems to be the fact, and is sufficiently indicated, perhaps, without the aid of one. But the showing so made, at best, is minute, and, while so far as it goes it favors the idea of a head, it is not inconsistent, on the other hand, with a pin, substantially—that is to say, for all practical purposes—without one.

Neither is anything by way of a limitation to be made out of what took place in the Patent Office, leading up to the obtaining of a patent, prior to the interference proceedings. It is true that the inventor at the outstart, for the purpose of distinguishing certain references which were brought up against him, made some very positive and reiterated declarations as to the headless character of his pivot pins. Thus, for instance, in the specifications of the original application, filed November 18, 1899, it is said:

"The ends of the pivot pins instead of standing in the countersinks made in the outer sides of the body of the needle, practically stand in and constitute the bottoms of the countersinks made in said body, the ends of the pivot pins in the bottoms of the countersinks presenting preferably a slight concavity, no part of the pivot pin projecting into the countersink."

And, again, referring to the action of the dies in compressing the ends of the pins:

"In this way, the outer ends of the pivot pins are not upset, in such a way as to make heads to stand in the countersinks, but the pivot pin is simply shortened and expanded, filling closely the hole in the body of the needle * * * the ends of the pivot pins not being enlarged to present heads to stand in, or in any way fill or overlap the bottoms of the countersinks."

So, also, after the rejection of the application, on the Mitlacher (German) patent, new claims having been brought in, it was pointed out, for the purpose of distinguishing the device there shown, that when the rivets were pressed endwise to shorten them the ends would spread out over the bottom of the countersinks previously formed, with the result that the rivet ends would not be flush or coincident with the bottom of the countersinks, or in substantially the same plane, as specified in the applicant's claims, but would be headed over, instead, upon the bottom of the countersinks, so that the ends of the rivets and the bottom of the countersinks would be in different planes, a distance apart equal to the thickness of the head of the rivets; while in the method pursued by the applicant, on the contrary, the ends of the rivets and the body of the needle, as it is declared, are countersunk evenly, the metal of the one not crawling over or overlapping the metal of the other. And, again, when the application was a second time rejected, on the Huke and Weston patent, which shows heads, certain changes and amendments being thereupon introduced, it was argued to the examiner that, by reference to the specifications and drawings, it would be seen that in the applicant's needles there were no heads on the ends of the pivot pin, but that, instead of this, they were of substantially uniform size, the ends of the pins forming the central portion of the bottom of the countersinks, the ends of the Huke pin, on the other hand, not being of uniform size, but formed with heads or enlarged portions that filled the countersinks.

Notwithstanding, however, the repeated disclaimers so made, on August 26, 1901, after certain intermediate proceedings which it is not necessary to dwell upon, a new and completely revised application was filed, with specifications the same as appear in the present patent, and with five claims, the first three coinciding with those which we have here, but the fourth and fifth expressly declaring for pivot ends enlarged to form heads filling the countersinks. What inspired this radical change of front or by what means it was brought about there is nothing to suggest, nor is it important to know. Treating the new application as a continuance of the earlier one in the face of this departure, and accepting the device as patentable, notwithstanding the references which had been cited against it and the position previously taken—the headed as well as the headless form—the examiner, September 24, 1901, declared the claims to be allowable, thereby putting the case in shape to pass to issue. It is this final form in which it was thus cast, and not the earlier one, which must be regarded in determining the scope of the invention, and whether any position was assumed in the Patent Office which is inconsistent with the one now taken, by which it is consequently limited; having respect to which it is to be observed, that reversing the ordinary experience the inven-

tor was permitted to enlarge his claims, where at first he was led to retract them, including what he had previously thought necessary to discard and differentiate in order to save his invention, and he is not to be forced back now to the narrower construction by reason of anything which was said in that connection, it not having been insisted upon. The invention, in other words, stands as it was asserted and accepted at the close of the proceedings, regardless of what had passed previously, and to that extent, if otherwise allowable, it is entitled to be maintained.

Unfortunately, however, for the complainants, the same cannot be said of that which followed. Pending at the time in the office was an application by Beckert, the defendant's principal, mentioned above, filed August 4, 1900, which was also for a pivot pin, with ends "compressed to form depressions," and which, after somewhat similar vicissitudes, was on the way to be accepted and put in shape for allowance, about the same time as the other. Between this and the Currier application, therefore, an interference was declared, December 24, 1901, to determine who was the prior inventor, four counts being framed, coinciding with the first four claims of the Currier application, the fifth claim being involved in the disposition of the fourth. Each of the contesting parties, according to the practice of the Patent Office, being thereupon called on to make a preliminary statement as to the date of the conception of his invention, January 26, 1901, was assigned by Currier as that of the headed form; the conception of the headless being fixed in the early part of August, 1897. The time so given for the headed pin, it will be noted, was after the application of Beckert had been filed, the conception of the latter, according to his affidavit, being still earlier, and judgment as to this was accordingly rendered on the face of the record, without more, October 17, 1902, in Beckert's favor; the right of Currier, on the other hand, to the headless form, being at the same time sustained. The invention was thus in effect divided, one party getting the headless and the other the headed pin. Currier subsequently tried to reopen the case, but without success; and later on was instrumental in having public use proceedings instituted against Beckert, by which in the end the right of the latter to a patent for the headed form, which had been apparently established, was defeated and a patent refused him. Accepting the situation, however, as to himself, meantime, on October 9, 1903, Currier canceled the claims covering headed ends, and requesting that the case be passed to issue took out the patent, November 3, following, as it now stands.

There can be no question upon this showing as to Currier being precluded from asserting a right under his patent to anything but a headless pin. Not only as the result of the interference proceedings was priority of invention accorded to Beckert as to the headed form, which may not be conclusive; but, by the direct action of Currier in response to it, the two claims, in which headed ends were declared for, were canceled, and a patent accepted by him in this restricted shape. Thereafter, whatever the original breadth of the invention, or to whatever extent it may have been previously practiced, the right to lay claim to headed ends as a part of it was gone, and cannot be revived. The

specifications were not changed, it is true, and having been framed to cover headed, as well as headless ends, it explains how they now seem to give countenance to both. But that is of no consequence. It is true, also, that in the public use proceedings, which, as already stated, were instituted in order to defeat Beckert's right to a patent for a headed pin, it was shown that, while Beckert could not carry back his invention beyond June, 1900, pins with heads, substantially the same as are in controversy here were made and sold by the Dodge Needle Company, where Currier was employed, as early as March 1898. This, of course, was fatal to Beckert, but did not help Currier, whose status was not changed by it, nor his rights restored; his patent having been already taken out. It merely made public property of the headed form, which could not thereafter be monopolized by any one. It may have established, as between Currier and Beckert, contrary to the result in the interference proceedings, that Currier was entitled to priority, as to the headed as well as the headless ends. But the trouble is that it came too late to be of any benefit to him, either then or now. If it be said that the patent, as issued, is broad enough to cover both forms, both being spoken of in the specifications, and there being nothing inconsistent in the claims, the patentable feature of the invention, as declared by the examiner, being the compression of the side walls of the needle along with the ends of the pins to form depressions, in which the heads, as such, play no part, it is to be answered that, not only does this overlook the fact that Currier, having been compelled to cancel his claims for headed pins, whether rightly or wrongly, is now estopped from asserting the form which they covered, but, also, going back of this, that the right to a headed pin as a patentable part of the invention is only maintainable on the strength of the application of August 26, 1901, which, in view of the disclaimers which preceded it and the entirely new and enlarged conception of the invention introduced by it, cannot be properly treated as a continuance of the original—the examiner to the contrary notwithstanding—and that, taken as new, as it must be, it is met by the two years' prior public use of headed pins of this character by the Dodge Needle Company, which Dodge and Currier have themselves established, which effectually disposes of it.

This is sufficiently decisive of the case, but the same result is reached by another and independent course. Assuming for the sake of argument, notwithstanding what has just been said, that so far as concerns the proceedings in the Patent Office the inventor, after all, was left with a free hand, the prior art is still to be reckoned with, and cannot, in my judgment, be overcome. Nothing directly anticipating the construction in controversy, it may be, is to be found before the Huke and Weston (1898) patent is reached, the others which are cited, such as the first, second, and third Adams, the Jackman and Flanders, the Mitlacher, and the Treat, being concerned with other structural features which sufficiently distinguish them. All, indeed, are progressively engaged with, and seek to solve the same general problem of securing the pin firmly in place without unduly weakening the needle body, or leaving a roughness or burr at the point of union with the sides, to catch and entangle the fiber of the yarn, and all have necessarily, there-

fore, certain more or less common points of resemblance. But in none
except the Huke and Weston, and one figure of the Mitlacher, is there
a depression of the ends of the pin below the sides of the needle, which
at the same time extends to and involves a portion of the circum-
jacent surface; the ends of the needle coinciding or being flush with
and forming a part of the bottom of such depression, the same as in
the device in suit. That this structural form, however, does appear
in the two mentioned, there can be no question; and, still more to the
point, in the Huke and Weston there is a plainly headed pin, the bevel
or flange of which extends over and binds upon the walls of the pin
hole, the outer extremity at the same time combining with the adjacent
parts to make up the bottom of the depression formed in the side of the
needle. In configuration and structure this is indistinguishable from
the headed form of pin and depression which is now in controversy,
which it thus apparently anticipates, for confirmation of which it is
not necessary to go further than the argument made to the examiner
when the Huke and Weston patent was cited against the original Cur-
rier application; the only distinction there attempted, aside from the
method of forming the depression, being that, while the Huke and
Weston pins had heads which extended over onto and stood in the
bottom of the countersinks, the ends of the Currier pins were of uni-
form size, and stood flush with and formed a part of the bottom of the
depression, which could not be said of the other—a distinction which
disappears in the present contention.

It is sought to overcome this result, however, by the fact that in
the device in suit the ends of the pins are "compressed to form de-
pressions," as it is expressed in the patent; that is to say, that the de-
pressions in the sides of the needle, by which the point of union be-
tween the end of the pin and the needle body is carried down and away
from contact with the yarn, are made by pressure exerted upon the
ends of the pins and the surrounding surface by the dies or punches,
instead of being dressed out or cut with a tool, as in the Huke and
Weston, the one removing all chance of a burr or roughness, as it is
claimed, where the other is altogether likely to produce it, the dis-
tinction constituting the virtue and the patentable feature of the
invention. But the patent is not for a product—the result of a method
or process—but for an article of special mechanical structure, into
which the method of manufacture cannot enter as a patentable element.
The question is one of structural form, and not how this may happen
to be brought about, as to which, if this were not the case, two articles,
absolutely indistinguishable in shape, size, construction, and useful
qualities, would not conflict, provided one was made by one method,
and the other by another, a position which will hardly be contended for.
In the present comparison a Huke and Weston needle does not neces-
sarily have a roughness or burr. It may or it may not, according to cir-
cumstances. Perhaps it is more likely to have, as well as to be
structurally weaker, because it is recessed by means of a tool, instead
of being compressed between dies. But this is the most that can be
said. And dressing off with a tool is only given as a preferred way,
to which the invention is not thus confined. Outside of this, it is in
all respects the same as the Currier needle, the headless as well as the

headed form. And the use of compressing dies to force in the heads and surrounding surface to form depressions, which is the only distinction asserted, being in no respect new, it certainly involved no invention, even if the method of manufacture was open for consideration, to substitute it in place of another method in vogue, based upon possibly advantageous results. The Huke and Weston needle being, therefore, a clear anticipation as to headed if not headless pins, the patent for this reason also cannot be construed so as to include them, and the defendant does not infringe.

Let a decree be drawn dismissing the bill on the ground of non-infringement, with costs.