McCORMICK WATERPROOF PORTLAND CEMENT CO. et al. v. MEDUSA CONCRETE WATERPROOFING CO.

(Circuit Court of Appeals, Seventh Circuit.    January 5, 1915.)

No. 2136.

1. PATENTS ☞328—VALIDITY AND INFRINGEMENT—WATERPROOF CEMENT.

The Newberry patent, No. 851,247, for a waterproof Portland cement and process of making same, which process consists in mixing with the cement a small percentage of an insoluble lime salt of a fatty acid, preferably stearate of lime, substantially free from glycerine or other soluble substance, was not anticipated, and covers an invention of a very high order. Nor is the patent limited by the proceedings in the Patent Office to a product absolutely free from any soluble substance.    Also *held* infringed.

2. PATENTS ☞168—CONSTRUCTION—LIMITATION BY PROCEEDINGS IN PATENT OFFICE.

Arguments and explanations in support of an application for a patent, to make clear the true nature and merits of the invention, and amendments to emphasize them, are not to be construed as limitations on the claims of the patent as allowed.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 243½, 244; Dec. Dig. ☞168.]

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois; Kenesaw M. Landis, Judge.

Suit in equity by the Medusa Concrete Waterproofing Company against the McCormick Waterproof Portland Cement Company and Sidney T. Sjoberg. Decree for complainant, and defendants appeal. Affirmed.

Appellants ask to be freed from the decree that adjudged them to be infringers of patent No. 851,247, April 23, 1907, to Newberry, appellee's assignor, for waterproof Portland cement and process of making same.

The specification and claims read as follows:

A. "The invention is in part a process of rendering cement waterproof, which consists in mixing therewith a small percentage of an insoluble lime salt of a fatty acid, preferably stearate of lime, substantially free from glycerine or other soluble substance.

"It also consists in the product of that process, namely, a cement rendered waterproof by the mixture therewith of a small percentage of an insoluble lime salt of one of the fatty acids, preferably stearate of lime.

"The stearate of lime to be employed may be made in any suitable manner. It may be made by a dry process, to wit, by heating one part of stearic acid with two parts (more or less) of dried slaked lime; or it may be made by a wet process, to wit, by adding the stearic acid to hot milk of lime. Specifically. fifty pounds, more or less, of quicklime may be slaked in a hundred pounds, more or less, of water, and to this mixture, while it is still hot, may be added about thirty pounds of stearic acid. The resultant stearate of lime is to be dried so that it is in the form of a dry powder. The resultant of either method of operation, above described, is an insoluble stearate of lime, mixed with a greater or less excess of hydrate of lime, according to the quantity of lime employed.

"The stearate of lime may be added to the cement clinker and ground therewith. I prefer, however, to add it to the finished dry cement. In fact it is preferable to keep the cement and the stearate of lime separated until a waterproof cement is required for use. I have found that 1 or 2 per cent. of stearate of lime, added to the dry cement, is all that is required to render the mortar

or concrete made therefrom absolutely and permanently impervious to water; and this is true even when cement is mixed with so large a proportion of sand as five parts of sand to one of cement.

B. "I am aware that various materials have been proposed, and to some extent used, as additions to cement and plaster to prevent the absorption of water. These various materials have been produced by saponifying, in various ways, various kinds of fats, oils, and waxes. But all of said materials heretofore proposed or used for this purpose have retained the glycerine which is set free by the saponification, and have, in fact, been soft soaps. They are, therefore, in part, soluble in water; that is to say, the glycerine therein is soluble. For this reason cement or plaster, with which these materials are mixed, is not impervious to water, and becomes less so as the glycerine is dissolved by the water. The waterproofing material hereinbefore described is, however, free from glycerine or any other material soluble in water, being a lime salt of a fatty acid, which acids are, as is known to all chemists, formed from fats by breaking up the chemical combination of the glycerine with said fatty acids, and segregating them from the glycerine. The lime salt of a fatty acid is absolutely insoluble in water; and the addition of this substance to cement or plaster in the manner and substantially the proportions heretofore described renders the resultant compound, when set, substantially and permanently waterproof.

"I claim:

"1. The process of rendering cement waterproof, which consists in mixing therewith a small percentage of the insoluble lime salt of a fatty acid, substantially free from glycerine or other soluble substance.

"2. The process of rendering cement waterproof, which consists in mixing therewith a small percentage of insoluble stearate of lime, substantially free from glycerine or other soluble substance.

"3. A composition of matter resulting from the described process, which consists of cement mixed with a small percentage of the insoluble lime salt of a fatty acid, substantially free from glycerine or other soluble substance.

"4. A composition of matter, which consists of cement mixed with a small percentage of insoluble stearate of lime, substantially free from glycerine or other soluble substance."

Forest P. Tralles, of St. Louis, Mo., for appellants.
Francis W. Parker, of Chicago, Ill., for appellee.
Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

BAKER, Circuit Judge (after stating the facts as above). [1] A block of artificial stone, made from a mixture of Portland cement and sand or other calcareous matter, appears to be solid; but in it there are many microscopic pores or capillary tubes; and these constitute from 20 per cent. to 40 per cent. of the cubic contents. This characteristic of concrete was known for 40 years before Newberry filed his application in March, 1905. As concrete had long and increasingly been used in constructions that contact with water, as in reservoirs, aqueducts, tunnels, and the like, the desirability of having concrete impervious to water had been constantly appreciated.

Men of high class—civil and mechanical engineers—had given much thought and devoted great effort to a solution of the problem. Numerous prior patents and publications, from 1863 to 1904, were introduced by appellants; but it will not be necessary to review more than two or three of them to illustrate the fact that none reached the goal, that none made any impress upon the practical art. This is so because a large volume of clear testimony establishes that, until the Newberry product was on the market and in successful use (starting

in 1905 with a few thousand pounds and rising in 1911 to a million pounds a year), manufacturers and dealers in cement, contractors and builders of concrete structures, chemists, civil and mechanical engineers, had known of nothing that would produce impervious concrete. In 1903 the question for discussion before the American Society of Civil Engineers was: "Is it possible to make concrete which will be impervious to water? If so, what is the best method?" A paper was read, and a general discussion was participated in by a large number of civil engineers. And in 1904 "Some Notes of Cost of Waterproofing the Concrete Lining of Reservoirs" was published. Five engineers contributed to this publication. The sum of the proceedings in those two years was to show that the competent men who were familiar with the literature of the subject and were also concerned with the practical art knew of no means that were more than halfway efficient.

Workers in the prior art for 40 years had been going along very natural lines. Holes in the concrete? Well, use finer particles of calcareous matter, put into the mixture a larger proportion of pure cement, and tamp or compress the mixture more firmly before it sets. But this, while substantially increasing the material and labor costs, only partially reduced the total space taken up by the "voids." Why not stop up the pores by covering the surface of the concrete with a cement paint or mineral paint? But those surface applications were liable to scale or be broken off, and what was wanted was a concrete which in itself should be impervious to water. Why not impregnate the concrete as far as possible from the outside by applying a solution that will enter and stop up the pores? Or put into the mixture a substance that will fill the pores in the concrete as it is being worked into form? But these methods, only halfway efficient at best, furnished no practical answer to the problem. For, if you cannot have a concrete that is completely impervious, what ultimate good is accomplished by simply delaying for a time the ultimate water-soaking of the structure?

Specifically we need notice only the Sylvester process and the Liebold and Nieske patents. The Sylvester process "consists in applying a wash of a solution of soap, which is allowed to soak into the surface of the concrete, and is then followed by a wash of a solution of alum. The soap enters the voids of the concrete and is followed by the alum. Where these two unite the chemical action precipitates an insoluble compound, which fills the voids in the concrete and renders it impermeable." That was the theory; but, because soluble as well as insoluble compounds were precipitated, and because the soluble compounds were leached out of the pores, the process never made the slightest impression upon the practical art. Liebold proposed applying to the cement before it is ground a mixture of Japanese vegetable wax, caustic alkali, and boiling water. This compound would contain glycerine, and other products soluble in water, and would therefore permit the proposed filler to be substantially leached out of the pores. Nieske's patent in 1892, which is the only portion of the prior art relied on by appellants in this court, proposed to add to cement about one-tenth in bulk of either aluminum acetate or aluminum palmitate. Aluminum acetate

is soluble in water. Aluminum palmitate is insoluble; but no way is shown of producing it without having associated with it water-soluble substances; and there is no evidence that it has been or can be practically used. And when Nieske declared that aluminum acetate and aluminum palmitate might be used as equivalents in his compound, he certainly failed to show that the Newberry conception had ever entered his mind.

Now, what was Newberry's solution of the problem? He said: It is unnecessary to attempt to pack the voids with a filler, or to stop up the pores with a paint, if you will consider the physical law that causes the water to enter them. That law is capillary attraction. The walls of the capillary tubes are water-attractile, and so the water climbs up them. These capillary tubes may be disregarded, if their walls, instead of being water-attractile, are made water-repellant. The insoluble lime salt of a fatty acid is a water-repellant. One per cent. of that insoluble salt, of course, cannot serve as a filler for the 20 per cent. to 40 per cent. of voids in the concrete; but it can so change the character of the walls of the capillary tubes that water will be repelled and the concrete will be permanently waterproof. Preferably the insoluble lime salt of a fatty acid should be pure, for so it is most thoroughly water-repellant. If it were adulterated with glycerine or other water-attractile substances, the water-repellant power of the insoluble lime salt might be so far overcome that the primary water-attractile quality of the walls of the capillary tubes would remain in action; and therefore you must use an insoluble lime salt that is substantially free from water-attractile substances—that is, so far free that the water-repellant power of the insoluble lime salt will not be overcome.

This solution of the problem was not a haphazard achievement. Newberry, the patentee, was graduated in science at Columbia in 1878. In 1880 he received from the same University the degree of Doctor of Philosophy. He was a student of chemistry at the Universities of Berlin and Paris in 1880 and 1881. He was Professor of Chemistry at Cornell from 1882 to 1892. From that time on he occupied himself with the chemistry of cements and other industrial products. With an accurate knowledge of what had gone before, his own large vision and his independent investigation along an untried line led him to success. His patent is clear. Inexpert workers in concrete are plainly told how to achieve the new result in the best way. And in the light of this record we believe he is to be credited with an invention of a very high order.

Against the finding of infringement the strongest insistence is that the patent affords no ground for relief unless the alleged infringer uses an insoluble lime salt of a fatty acid that is absolutely free from glycerine or other soluble substance. The specification and claims are not thus limited; but it is contended that the history of the application requires this restriction. When the application was originally filed, the specification did not include the phrase "substantially free from glycerine or other soluble substance" in the paragraph we have marked A, nor did the paragraph marked B appear therein; and

the claims called for mixing with cement a small percentage of stearate of lime. The examiner, failing to comprehend the invention, rejected the claims on reference to the Liebold process, stating that the amount of glycerine which would be produced thereby could not materially affect the result. Applicant then amended by adding to the claims the phrase "free from glycerine or other soluble substance"; and the examiner, still failing to appreciate Newberry's achievement, maintained the same position, and stated that the denial of the presence of a useless substance was not sufficient to carry the claims over the references. Thereupon applicant amended the specification by putting in the paragraphs marked A and B, and redrafted the claims in their present form. The amendments were accompanied by an argument which enabled the examiner to understand the true nature of the invention, and to realize the significance of the expressions "a small percentage" and "substantially free from glycerine or other soluble substance"; and thereupon the application was promptly allowed. The significance of these quoted expressions, in the light of the disclosures of the specifications, was perfectly clear to those versed in the cement art.

[2] We perceive no limitation or disclaimer in the file wrapper. Arguments and explanations, and amendments to emphasize them, are not to be so construed. Goodyear Dental Vulcanite Co. v. Davis, 102 U. S. 222, 26 L. Ed. 149; Daylight Prism Co. v. Marcus Prism Co. (C. C.) 110 Fed. 980; Dodge Needle Co. v. Jones (C. C.) 153 Fed. 186.

On behalf of appellants a competent and reputable chemist testified that he had analyzed appellants' product and found glycerine therein. Three competent and reputable chemists testified for appellee that they had analyzed appellants' product and that it was free from glycerine or other substance soluble in water. So the finding of infringement might well be affirmed, even if the Newberry patent required absolute freedom from soluble substances. But on appellants' own showing we think it is clear that the patent, giving it its true scope and meaning, has been infringed. While Liebold and others of the prior art showed an insoluble lime salt of a fatty acid, they showed at the same time the presence of glycerine and other soluble substances. Their compounds contained from 85 per cent. to 90 per cent. of stearate of lime and 10 per cent. to 15 per cent. of glycerine. These compounds were inefficient, because the percentage of water-attractile substance was so high that it counteracted the water-repellant substance. "Substantially free from glycerine or other soluble substance," therefore, means that the insoluble lime salt of the fatty acid must have a purity of more than 90 per cent.; and the higher the degree of purity, the more efficient the compound. According to the analysis of appellants' chemist their compound contained about 4 per cent. of glycerine. Appellants put into the record what they claim is the formula of their process of manufacture. One side asserts that the use of the stated ingredients would necessarily result in the presence of glycerine; the other contends that whatever glycerine might otherwise be produced is vaporized and disappears during the heating and dry-

ing processes of the manufacture. But it is unnecessary to enter into the contentions and differences of the chemists, for one fact alone is sufficient, in our judgment, to demonstrate infringement, and that fact is that appellants are putting forth a waterproofing compound that does the work, and does it confessedly on the water-repellant principle disclosed by Newberry, for appellants rely on the water-repellant power of "a small percentage" (less than 1 per cent.) of "stearate of lime." Consequently it is manifest that appellants' compound is "substantially free from glycerine or other soluble substance"; that is, if soluble substances are present at all, they are present in such relatively small quantities that they do not materially detract from the water-repellant power of the insoluble stearate of lime which both parties use and rely on to attain the desired result.

The decree is affirmed.